**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

Marie LaVenture, *et al.*

               Plaintiffs,

       v.                                      CASE No.: 1:14-cv-01611-SLT-RLM

United Nations, *et al.*                     **MEMORANDUM OF LAW**

               Defendants.                Oral Argument Requested

---

## <u>MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S STATEMENT OF INTEREST</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………………………................. iii

PRELIMINARY STATEMENT……………………………………………………………............ 1

FACTS………………………………………………………………………………………………… 5

STANDARD OF REVIEW……………………………………………………………………... 5

ARGUMENT……………………………………………………………………………………. 6
.

    I.      THERE IS NOTHING IN SECTION 2 OF THE CPIUN TO SUGGEST
           THAT "…in any particular case…" MEANS EXPRESS WAIVER OF
           IMMUNITY MUST OCCUR SEPARATELY IN EACH INDIVIDUAL
           CASE, AND ONLY AFTER A CLAIM HAS BEEN FILED……………............ 6

    II.     FOR THE UN TO RECOGNIZE AND ACCEPT LIABILITY IS AN
           UNEQUIVOCAL EXPRESSION THAT THE UN WILL SUBMIT TO
           THE ENFORCEMENT OF ITS RESPONSIBILITY IN LAW OR JUSTICE,
           AND THUS AN EXPRESS WAIVER OF IMMUNITY………………………… 8

    III.    WHILE THE OPINION OF THE EXECUTIVE BRANCH IS NORMALLY
           GIVEN "GREAT WEIGHT," IT SHOULD NOT BE GIVEN SUCH
           DEFERENCE IN THIS CASE…………………………………………………... 15

    IV.    SERVICE ON THE DEFENDANTS WAS EFFECTIVE………………………. 17

CONCLUSION…………………………………………………………………………………. 19

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*Bisson v. United Nations*, No. 06 Civ. 6352(PAC)(AJP), 2007 WL 2154181 (S.D.N.Y. 2007)…... 5

*Breslaw v. Rightmire*, 119 Misc. 833 (N.Y. Cnty. Ct. 1922) ………………………………………… 8

*Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010) ……………………………………………1, 3, 13

*David v. Total Identity Corp.*, 857 N.Y.S.2d 380 (N.Y. App. Div. 2008)…………………………... 18

*Dennick* v. *Railroad Co.*, 103 U.S. 11, 18, 26 L. Ed. 439 (1881)…………………………………… 14

*Ehrlich v. Am. Airlines, Inc.,* 360 F.3d 366 (2d Cir. 2004) ………………………………………… 15

*Fire Asso. of Philadelphia v. Allis Chalmers Mfg. Co.*, 129 F. Supp. 335 (N.D. Iowa, 1955)……… 8-9

*Georges v. United Nations,* 834 F.3d 88 (2d Cir. 2016)…………………………………………… 1, 6, 8, 13

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)………. 8

*Kiobel v. Royal Dutch Petroleum Co. (Kiobel I)*, 621 F.3d 111, at 152 (2d Cir. 2010)………………1-2

*Kirsch v. Barnes*, 263 F.2d 692 (9th Cir. 1959)…………………………………………………… 9

*Krenger v. Pennsylvania R. Co.,* 174 F.2d 556 (2d Cir. 1949)……………………………………… 9

*Libra Bank Ltd. v. Banco Nacional De Costa Rica*, 676 F.2d 47 (2d Cir. 1982)…………………… 13

*Liebeskind v. Liebeskind*, 449 N.Y.S.2d 226 (N.Y. App. Div. 1982)………………………………18

*Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012)……………………………………………………… 15

*Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 175 A. 62 (N.J. Ct. Err. & App. 1934)………………… 9

*Luckett v. Bure*, 290 F.3d 493 (2d Cir. 2002)………………………………………………………… 5

*Markoff v. S. Nassau Cmty. Hosp.*, 458 N.Y.S.2d 672 (N.Y. App. Div. 1983),
*aff'd* 473 N.Y.S.2d 766 (1984)……………………………………………………………………… 18

*McElfresh v. Kirkendall*, 36 Iowa 224 (1873)……………………………………………………… 8

*Medellin v. Texas*, 552 U.S. 491, 513 (2008)………………………………………………………… 15

*Metromedia Co. v. Cowan*, 13 CIV. 03787 LGS, 2013 WL 4780039 (S.D.N.Y. June 24, 2013)……. 18

*Noble v. Crazetees.com*, No. 13-cv-5086 (PAE), slip op. (S.D.N.Y. Jan. 28, 2014)………………… 18

*Rasmus v. A. O. Smith Corp.,* 158 F. Supp. 70 (N.D. Iowa, 1958)…………………………………… 8

*Sadikoglu v. United Nations Dev. Programme*, No. 11 Civ. 0294(PKC),
2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011)……………………………………………….. 5

*Safadjou v. Mohammadi*, 964 N.Y.S.2d 801 (N.Y. App. Div. 2013)…………………………….. 18

*Sanders v. Szubin*, 828 F. Supp. 2d 542 (E.D.N.Y. 2011) ……………………………………… 15

*Shamsee v. Shamsee,* 74 A.D.2d 357 (N.Y. App. Div. 1980) ………………………………… 15

*Snyder v. Energy Inc.*, 857 N.Y.S.2d 442, 446 (N.Y. Civ. Ct. 2008) …………………………… 18

*Tachiona vs. Mugabe*, 386 F.3d 205 (2d Cir. 2004) ……………………………………………19

Tarros S.p.A. v. United States, No. 13 CIV. 1932 (JPO),
2013 WL 6084243 (S.D.N.Y. Nov. 19, 2013) …………………………………………………...5

*U.S. v. Bahel,* 662 F.3d 610 (2d Circuit, 2011)……………………………………………….14

*United States v. Chalmers,* No. S5 05 CR 59(DC), 2007 U.S. Dist. LEXIS 13232, 2007 WL 624063
(S.D.N.Y. Feb. 26, 2007) ……………………………………………………………………… 13

*United States v. Ron Pair Enterprises Inc.,* 489 U.S. 235, 109 S.Ct. 1026, L.Ed.2d 290 (1982)……….., 8

*Wells Fargo Bank, N.A. v. Ullah* No. 13 CIV. 0485 (JPO), 2014 WL 470883 (S.D.N.Y. Feb. 6, 2014)... 5

*Wood v. Currey*, 1881, 57 Cal. 208, (Cal. S.Ct., 1881) ……………………………………………,9


**SECONDARY SOURCES**

74 Am. Jur. 2d, §50 (2012)……………………………………………………………………… 9

*Black's Law Dictionary* (10th ed. 2014), Liability…………………………………………………… 9

2 *Bouvier L. Dict.* 1950…………………………………………………………………………… 9

*Immunity of International Organizations* (Brill | Nijoff, 2015)…………………………………………... 1

*Restatement (Third) of the Foreign Relations Law of the U.S.*, § 326…………………………………… 15

Reinisch, August, *The Conventions on the Privileges and Immunities
of the United Nations and its Specialized Agencies: A Commentary*
(Oxford Commentaries on International Law, 2016)……………………………………………….. 7

## PRELIMINARY STATEMENT

This Memorandum of Law is in response to the Court's order of June 12, 2017 (ECF No. 19), allowing Plaintiffs to submit a brief responding to the United States Government's Statement of Interest filed on May 24, 2017 (ECF No. 17). Plaintiffs seek to represent a class of victims, including residents of the Eastern District, in an action against the United Nations ("UN"), the UN Stabilization Mission in Haiti ("MINUSTAH") and certain UN and MINUSTAH officials, including former UN Secretary-General Ban Ki Moon, seeking justice for the UN's tortious acts in introducing a cholera epidemic into Haiti in 2010. Proximate cause is not at issue: The UN has admitted responsibility for actions which, as of this filing, have killed an estimated 10,000 people, and sickened, it is estimated, close to 1 million more.[1]

The questions before the court are undoubtedly of first impression, questions that were not addressed by either *Brzak v. United Nations,* 597 F.3d 107, 112 (2d Cir. 2010), or *Georges v. United Nations,* 834 F.3d 88 (2d Cir. 2016): specifically, whether the fact that the UN has stated, repeatedly and unambiguously, that they would accept liability for damages caused by UN peacekeeping forces not in the service of operational necessity is an express waiver of immunity from legal process as required by Article II, Section 2 ("Section 2") of the U.N. Convention on the Privileges and Immunities of the United Nations ("CPIUN"). Flowing from this is a second, related question: whether, under Section 2 of the CPIUN, an express waiver of immunity is only effective if given in each single, individual claim, at the time such claim is presented before a court. That this Court is bound by the decisions in *Brzak* and *Georges* is not in dispute.

Beyond *Brzak* and *Georges*, the law surrounding the immunity of the United Nations is scant.[2] There is generally considered to be no customary international law on immunity; the law of the individual Nations governs.[3] According to the Court of Appeals for the Second Circuit, in fact, "…[I]nternational law [is] "a sparse body of norms . . . " which lacks comprehensive rules regarding liability and so "leaves

---

[1] See, e.g., https://www.nytimes.com/2017/03/19/world/americas/cholera-haiti-united-nations.html
[2] See, generally, *Immunity of International Organizations* (Brill | Nijoff, 2015), Chapter 3*: Immunity Under Customary International Law?,* at 39-40.
[3] Id., at 40.

the manner of enforcement . . . almost entirely to individual nations." *Kiobel v. Royal Dutch Petroleum Co. (Kiobel I)*, 621 F.3d 111, at 152 (2d Cir. 2010).

In this light, we perfectly understand and respect that the Court is skeptical of Plaintiffs' arguments in this case, and inclined to give deference to the Government's opinion as stated in its Statement of Interest. But as George Orwell famously argued in his 1946 essay "Politics and the English Language," clichéd language produces clichéd thinking. In that vein, Plaintiffs can think of nothing more Orwellian than the Government's Statement of Interest, including statements that Plaintiffs are alleging that it is the inadequacy of the claims process that is at the heart of Plaintiffs' case, or that "express waiver" must be given individually and separately as each claim against the United Nations in a particular jurisdiction is filed. Or the notion that repeated statements of the Secretary-General in reports to the UN General Assembly, which were then adopted by the General Assembly and therefore procedurally binding on the UN and which assert, clearly and unambiguously, that the United Nations accepts legal liability for damages in cases involving UN peacekeeping personnel that are not the result of operational necessity, are somehow merely "a general commitment to provide for compensation for injury to innocent third parties…"[4]

We respectfully request that, rather than rely on clichés, the Court consider what the law actually says, because Plaintiffs believe that the law says the following:

(1)     That express waiver of immunity requires <u>not</u> particular words or a formal letter from the UN, but rather "a clear and unambiguous manifestation of the intent to waive";

(2)     That to emphatically agree to and accept liability involves not just the acceptance of fault or responsibility; rather, it is an assertion that a party agrees to be <u>bound</u> by law or justice, by a duty which may be judicially enforced; and

(3)     That the Courts should not read into Section 2 of the CPIUN a requirement that express waiver of immunity can only be achieved in a particular case if it is stated separately, in response to each individual claim, and only after such claim is filed.

---

[4] See Government's Statement of Interest, page 5.

Again, we want to emphasize that this case is <u>not</u> about the adequacy of the claims process required under the United Nations' Status of Forces Agreement with Haiti (SOFA), nor the fact that a claims process in the instant case was never set up. Therefore, these questions were not decided by *Brzak* or *Georges*. Plaintiffs respect the immunity of the United Nations and understand its value. We acknowledge that the UN must enjoy immunity in certain circumstances to fulfill its core functions and mission. But we firmly believe that this Court can set aside Defendants' immunity in a case such as this without affecting UN immunity in other contexts. Since the evidence of express waiver is clear, the CPIUN should not be a shield to hide behind because the United Nations (or the U.S. Government) doesn't like the price tag that comes with the UN's indisputable gross negligence in this case.

And make no mistake: Such practical considerations are at the heart of the UN's reluctance to compensate the victims in Haiti—not vaunted, scholarly notions of international law or comity, or the ability to fulfill worthwhile missions on a global stage, but <u>money</u>. The United Nations doesn't want to pay for its gross negligence and willful misconduct in Haiti, for the suffering and death that continues to this very day. For that matter, neither does the United States, as a main contributor to such funding.

The UN and the Government have recognized, and represented to the court in *Brzak*, that immunity does not, and cannot, equate to impunity.[5] Yet is has become abundantly clear that these blanket assertions of UN immunity feed a ravenous impunity on the part of the organization that threatens its worthwhile mission around the world. The tragedy in Haiti is unprecedented, to be sure, but it is also only one of a string of misdeeds the United Nations has been engaged in over recent years. As just one example, consider the results of an April 2017 Associated Press investigation that showed that, for more than a decade, more than 100 UN peacekeepers in Haiti ran a child sex ring.[6] According to the article, "none was ever imprisoned."[7]

An unmitigated view of the UN's immunity is the fuel that feeds a destructive fire within the

---

[5] See *Brzak v. United Nations*, 06-CV-3432 (RWS), Memorandum of Law In Support of the Motion of the United Nations to Dismiss and to Intervene, at 4-5 (S.D.N.Y. Oct. 2, 2007).
[6] https://www.thestar.com/news/world/2017/04/12/un-peacekeepers-child-sex-ring-left-victims-but-no-arrests.html
[7] Id.

organization, allowing the misconduct and crimes, and the sickness and death, found so frequently in Haiti and other locales. The United Nations knows they can get away with it; they believe they are untouchable. They are confident there can be no accounting and no justice, so no real safeguards are put in place to prevent such calamities.[8]

In that regard, there can be little doubt that the next Haiti is out there just waiting to happen. Unless the United Nations is held accountable for actions in cases where it has repeatedly and specifically accepted liability and therefore expressly waived immunity, a tragedy on this scale will most certainly happen again. There is nothing to prevent it.

In the short-term interest of the UN and U.S. Government, the easiest thing would be to further feed this impunity: to find a reason, any reason, to support the notion that the immunity of the United Nations has not been expressly waived. The United States Government and the United Nations would breath a sigh of relief, assured once again that no one will be held financially accountable for the UN's role in the deaths of 10,000 Haitians and the sickening of a million more. The UN can go back to offering mere words and empty trust funds, while the United States and other nations can continue to maintain they won't contribute a single dime to ease the suffering.

But the notion that no one pays the price is dead wrong. The price has been paid since 2010 by the Haitian people and their families, including U.S. citizens, and including residents of the district this Court serves. While international organizations, the United States Government and others twist themselves into knots to find ways to evade judicial accounting for the devastation wrought in Haiti, Haitians continue to suffer and die—all because of the fact that, while justice might require the

---

[8] On this note, consider the example of Anthony Banbury, a longtime assistant secretary general who helped oversee peacekeeping, and who resigned in disgust in 2016, attacking the United Nations for allowing peacekeepers to rape and abuse the very people they were sent to help, all the while protecting their own bureaucracy. Banbury wrote in a *New York Times* op-ed that the UN has become "a black hole into which disappear countless tax dollars and human aspirations, never to be seen again," where "too many decisions are driven by political expediency instead of by the values of the United Nations or the facts on the ground." https://www.nytimes.com/2016/03/20/opinion/sunday/i-love-the-un-but-it-is-failing.html?_r=0

compensation of victims of this UN-wrought plague, justice in this case is impractical, too expensive, too inconvenient to be entertained.

While *realpolitik* may be the rule in the marbled hallways of U.S. Government and gilded circles of international diplomacy, we ask that it not be the province of this Court. In the face of a clear, unambiguous manifestation of the intent to waive, we respectfully request that this Court rule that the United Nations has expressly waived immunity in this particular type of case, and that the action before the Court be allowed to proceed.

## FACTS

In its order of June 12, 2017, the Court allowed Plaintiffs to file an Amended Complaint in this action, to add additional plaintiffs that have been identified as parties to this action and to reconcile the Complaint with the UN's recent admissions regarding its responsibility. These facts serve as the basis for this motion and are incorporated herein.

## STANDARD OF REVIEW

In its Statement of Interest, the Government argues that this Court lacks subject-matter jurisdiction to hear this case because Defendants are immune from legal process and suit. Accordingly, the Government's request for dismissal should be addressed under the standards governing a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1). See *Sadikoglu v. United Nations Dev. Programme*, No. 11 Civ. 0294(PKC), 2011 WL 4953994, at *2 (S.D.N.Y. Oct. 14, 2011); *Bisson v. United Nations*, No. 06 Civ. 6352(PAC)(AJP), 2007 WL 2154181, at *4 (S.D.N.Y. 2007). A case is properly dismissed under Rule 12(b)(1) when the Court "lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002).

A Rule 12(b)(1) motion is subject to the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Tarros S.p.A. v. United States*, No. 13 CIV. 1932 (JPO), 2013 WL 6084243, at *4 (S.D.N.Y. Nov. 19, 2013) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). In considering a motion to dismiss, the Court "must accept all material facts alleged in the Complaint as true and draw all reasonable inferences liberally in Plaintiff's favor." *Tarros S.p.A.*, at *4 (citing *Kwiatkowski*

*v. Polish & Slavic Fed. Credit Union*, 511 F. App'x 117, 118 (2d Cir. 2013)). If the plaintiff can prove

subject-matter jurisdiction by a preponderance of the evidence, the case should not be dismissed. *Wells*

*Fargo Bank, N.A. v. Ullah*, No. 13 CIV. 0485 (JPO), 2014 WL 470883, at *2 (S.D.N.Y. Feb. 6, 2014).

## ARGUMENT

I.    **THERE IS NOTHING IN SECTION 2 OF THE CPIUN TO SUGGEST THAT "…in any particular case…" MEANS EXPRESS WAIVER OF IMMUNITY MUST OCCUR SEPARATELY IN EACH INDIVIDUAL CASE, AND ONLY AFTER A CLAIM HAS BEEN FILED**

Article II, Section 2 of the CPIUN states that "[t]he United Nations, its property and assets

wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except

insofar as in any particular case it has expressly waived its immunity." In its Statement of Interest, the

Government places great stock in the notion that the CPIUN Section 2 reference to "in any particular

case" means that the United Nations must make an express statement waiving immunity, individually and

separately, at the time that each individual claim is brought before a Court. This assertion adds language

to Section 2 that is simply not there. Such an interpretation attempts to amend Section 2 to include a

requirement that express waiver only can be made after a claim as been filed, and in response to a single

individual proceeding. Section 2 says nothing like that.

As the Court in *Georges* found:

"The interpretation of a treaty, like the interpretation of a statute, begins with its text," and "[w]here the language of . . . [a] treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." (citations omitted)[9]

"[I]n any particular case" does not solely mean in each claim individually as it comes up. If the

drafters of the CPIUN had wanted it to say that, they would have. Neither the U.S. Government nor the

Court should amend Section 2 of the CPIUN to say what the drafters of the section did not include.

Rather, it is entirely within the United Nations' power under Section 2 to accept liability and waive

immunity in the event a particular case arises in the future, under particular circumstances, and/or to

---

[9] *Georges, at 9-10,* quoting *Abbott v. Abbott*, 560 U.S. 1, 10 (2010) and *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 457 (2d Cir. 2003).

qualify UN immunity within certain limits for any particular case that may arise. As described below, this is exactly what the Secretary-General of the United Nations did in statements contained in reports that were subsequently adopted by the United Nations General Assembly—a body consisting of all United Nations members, and therefore all signatories to the CPIUN—through General Assembly Resolution 52/247. There is nothing in the CPIUN that prohibits this or makes this something other than an "express" waiver, and indeed, the law of immunity generally has no such requirement.[10]

Put another way: If the Secretary-General of the United Nations were to issue a statement that was subsequently adopted by the United Nations General Assembly (and therefore binding upon the organization) and read: "We hereby waive immunity, up to the limits contained herein, in particular cases involving third-party claims against the Organization for personal injury, illness or death resulting from or attributable to the activities of members of peacekeeping operations which are not of operational necessity," few would question whether this is an express waiver. Nor would the UN then have to go in each time, in each individual case, and waive immunity again. Substitute "accept liability" for "waive immunity" in that sentence above and you have the exact sentiments expressed by the Secretary-General in Reports A/51/389 and A/51/903, which were subsequently adopted by the General Assembly in UN Resolution 247[11]. Therefore, the only question at issue is whether statements by the Secretary-General, repeatedly and unambiguously accepting liability for damages caused by peacekeeping operation, are an express waiver of immunity.

To view Section 2 other than as described above—to add in an interpretation that requires "in any particular case" to mean each, single, individual claim—amends Section 2, and as a practical matter

---

[10] While scholarly opinion on this point in international legal commentary is mixed, "…there is now practice to suggest that [Section 2] waiver in advance, for example by means of a contractual provision submitting disputes arising thereunder to a national jurisdiction, will be given effect by a national court…" Reinisch, August, *The Conventions on the Privileges and Immunities of the United Nations and its Specialized Agencies: A Commentary* (Oxford Commentaries on International Law, 2016), (IV)(A)(98),  note 228, quoting C Wickremasinghe, *International Organizations or Institutions, Immunities before National Courts*, in R Wolfrum, *Max Planck Encyclopedia of Public International Law,* at 10, para 9.
[11] UN A/RES/52/247

creates an absurdity: that the United Nations could pick and choose when to waive immunity based upon arbitrary and wholly unconscionable parameters, such whether they like or dislike the price tag of a particular claim; the political pressure or lack thereof surrounding a claim; the personalities involved; or perhaps the nationality, religion, gender or other characteristics of the parties. In that regard, Plaintiffs inevitably must pose to the Court the following question, which we stated publicly after this lawsuit was filed: if the United Nations had killed 10,000 people on the streets of Manhattan, or in Paris or Brussels, would we even be having this discussion? Would immunity have been waived, and 389/903/247 respected and <u>not</u> ignored in that case? Would, or could, the UN make such decisions based upon the character, color or relative wealth of the dead and injured in Manhattan, Paris or Brussels, whereas in the case of Haiti—a poor, often marginalized country with no particular weight on the international stage— immunity is not waived? To read new meaning or otherwise amend Section 2's "in any particular case" language would, and does, allow such a ridiculous result, in contravention of binding U.S. law as stated by the court in *Georges.*

Indeed, in the event that there is a dispute over the reasonable meaning of Section 2's "in any particular case" and what it means, and if the Court should determine that the plain meaning includes, exclusively, the absurd result contemplated above, U.S. law is quite clear: plain meaning is not conclusive in "rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).[12]

## II. FOR THE UN TO RECOGNIZE AND ACCEPT LIABILITY IS AN UNEQUIVOCAL EXPRESSION THAT THE UN WILL SUBMIT TO THE ENFORCEMENT OF ITS RESPONSIBILITY IN LAW OR JUSTICE, AND THUS AN EXPRESS WAIVER OF IMMUNITY

As described below, the Secretary-General of the United Nations has repeatedly, clearly and unambiguously agreed to accept liability for damages, not the result of operational necessity, caused by peacekeeping operations of UN forces.

---

[12] See also, *United States v. Ron Pair Enterprises Inc.,* 489 U.S. 235, 109 S.Ct. 1026, L.Ed.2d 290 (1982).

Liability, it should be noted, though a concept central to the law, has a meaning that is often misrepresented. Liability is <u>not</u> just agreeing that you are at fault. Liability is more than mere acceptance of responsibility, moral or otherwise. Rather, liability is defined in U.S. law as "the state of being **bound** or obliged in law or justice." (emphasis added).[13] As one federal court decision put it, liability is "the condition of one who is subject to a charge or duty which may be judicially enforced." *Kirsch v. Barnes*, 263 F.2d 692 (9th Cir. 1959).[14] Thus, "when the law grants an immunity… the defendant is absolved from liability." 74 Am. Jur. 2d, §50 (2012), at 702, citing *Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 175 A. 62 (N.J. Ct. Err. & App. 1934).

Moreover, it is the law of this very Circuit that accepting liability precludes immunity. As the Second Circuit stated in the seminal case *Krenger v. Pennsylvania R. Co.,* 174 F.2d 556, 559, cert. denied, 70 S. Ct. 140, 338 US 866, 94 L.Ed.531. (2d Cir. 1949): "…*liability* is quite differentiated from a mere duty to pay damages and serves as… the opposite of *immunity* or exemption." (emphasis in original). It should be noted that this principle is so axiomatic in American law that is appears in the 10th Edition of *Black's Law Dictionary* under the definition of "Liability."[15]

So, therefore, if a party agrees to be liable, they agree to be bound or obliged in law or justice. Without judicial enforcement, there can be no liability; to declare, therefore, that one is liable necessarily includes an express agreement to be subject to a charge or duty that may be judicially enforced.

On September 20, 1996, the Secretary-General of the United Nations issued report A/51/389 (hereinafter referred to as "389"), responding to a request of the General Assembly dated June 7, 1996, which requested cost estimates for third-party claims and adjustments for peacekeeping actions.[16] The Secretary-General's report 389, among other things, addressed "the scope of United Nations liability for activities of United Nations forces." In fulfilling the requirements of its mandate, the Secretary-General

---

[13] See e.g., *Breslaw v. Rightmire*, 119 Misc. 833 (N.Y. Cnty. Ct. 1922); *McElfresh v. Kirkendall*, 36 Iowa 224 (1873); *Rasmus v. A. O. Smith Corp.,* 158 F. Supp. 70 (N.D. Iowa, 1958); *Fire Asso. of Philadelphia v. Allis Chalmers Mfg. Co.*, 129 F. Supp. 335 (N.D. Iowa, 1955); 2 *Bouvier L. Dict.* 1950; and *Black's Law Dictionary* (10th ed. 2014), Liability.
[14] Citing *Wood v. Currey*, 1881, 57 Cal. 208, (Cal. S.Ct., 1881).
[15] *Black's Law Dictionary* (10th ed. 2014), Liability.
[16] UN Report A/51/389.

stated it was "necessary to describe the scope of the United Nations liability for the activities of United Nations forces."[17] Further, in the first paragraph of Section II of this report, entitled "Scope of United Nation's liability for activities of United Nations forces," the United Nations states its "principles of liability":

> The international responsibility of the United Nations for the activities of United Nations forces is an attribute of its international legal personality and its capacity to bear international rights and obligations. It is also a reflection of the principle of State responsibility — widely accepted to be applicable to international organizations — that damage caused in breach of an international obligation and which is attributable to the State (or to the Organization), entails the international responsibility of the State (or of the Organization) and its liability in compensation.[18]

The Secretary-General further states that "In recognition of its international responsibility for the activities of its forces, the United Nations has, since the inception of peacekeeping operations, assumed its liability for damage caused by members of its forces in the performance of their duties;" and that there is a "recognition on the part of the United Nations that liability for damage caused by members of United Nations forces is attributable to the Organization."[19]

Significantly, the United Nations then expressly states that "operational necessity" is "an exemption from liability,"— in other words, an area where the UN's immunity would be retained. The report defined "operational necessity" in considerable detail, stating that in order for an operational necessity exemption to apply, "…the action must be strictly necessary and not a matter of mere convenience or expediency. It must also leave little or no time for the commander to pursue another, less destructive option…. [t]he act must be executed in pursuance of an operational plan and not the result of a rash individual action," and "…[t]he damage caused should be proportional to what is strictly necessary

---

[17] Id., at 2.

[18] Id., at 4. Indeed, the report points out that, as early as 1965, the United Nations was recognizing this principle. In a letter dated 6 August 1965 from the Secretary-General to the representative of the Union of Soviet Socialist Republics concerning the payment of indemnities to Belgian citizens resident in the Democratic Republic of the Congo (S/6597), the United Nations stated:

> It has always been the policy of the United Nations, acting through the Secretary-General, to compensate individuals who have suffered damages for which the Organization was **legally liable**. This policy is in keeping with generally recognized legal principles and with the Convention on the Privileges and Immunities of the United Nations (emphasis added).

[19] Id.

in order to achieve the operational goal."[20]

In this case, negligently introducing cholera into Haiti, which UN forces did, by failing to properly test Nepalese peacekeepers for the presence of the disease before they entered Haiti, then constructing faulty sanitation facilities close to a river that was the main source of drinking water for nearby communities, would not be considered "operational necessity" under any definition of the term.

Report 389 then lays out, in considerable detail, limits to liability to be imposed through internal process for the settlement of claims. Also quite significantly, the UN states that contributing governments will be legally responsible for indemnifying the United Nations in cases where damages are caused by the willful misconduct of the peacekeeping forces:

> "The United Nations will be responsible for dealing with any claims by third parties where the loss of or damage to their property, or death or personal injury, was caused by the personnel or equipment provided by the Government in the performance of services or any other activity or operation under this Agreement. However, if the loss, damage, death or injury arose from gross negligence or wilful misconduct of the personnel provided by the Government, the Government will be liable for such claims.[21]

On May 21, 1997, the Secretary-General of the United Nations followed Report 389 with A/51/903, "Administrative and budgetary aspects of the financing of the United Nations peacekeeping operations: financing of the United Nations peacekeeping operations" (hereinafter referred to as "903")[22], which was defined as "supplemental" to report 389. This report lays further temporal and financial limitations to the liability of the organization through internal claims processes, but specifically excluded claims such as the action before the court today. The Secretary-General stated in 903 that:

> …no financial limitations are proposed with regard to claims arising as a result of gross negligence or wilful misconduct. If such claims are established, the Organization would assume liability to compensate a third party, retaining the right to seek recovery from the individual or the troop-contributing State concerned.[23]

903 also recommended changes to the liability clause of the model status-of-forces agreement that would recognize this new, clearly and unambiguously stated, acceptance of liability on the part of the

---

[20] Id., at 5.
[21] Id., at 11.
[22] UN A/51/903
[23] Id., at 5.

UN for damages caused through peacekeeping operations that were not the result of operational necessity: "A liability clause in the status-of-forces agreement would ensure that… the liability of the Organization would be binding… on the basis of its express consent."[24] 903 then lays out the new language for this liability clause—which is the language in the SOFA signed between the government of Haiti and United Nations of July 9, 2004.[25]

Both 389 and 903 were then expressly incorporated, agreed to and adopted by the United Nations General Assembly—whose members, as previously noted, are all signatories of the CPIUN—through UN Resolution 52/247, dated June 26, 1998 (hereinafter referred to as "52/247").[26] 52/247 expressly agrees to liability for "third-party claims against the Organization for personal injury, illness or death, and for property loss or damage (including non-consensual use of premises) resulting from or attributable to the activities of members of peacekeeping operations in the performance of their official duties."[27] It is a procedural resolution of the United Nations and therefore binding on the UN and its officials, and it was in the context of this resolution that Haiti signed the Status of Forces Agreement with the United Nations, permitting entry of UN troops on the condition of paying for injuries they caused.

The question before this court, therefore, is whether the express decision of the United Nations to accept liability and therefore be bound under law or justice to a charge or duty judicially enforced, as clearly and unambiguously stated in 389 and 903, and adopted by the United Nations General Assembly in resolution 52/247, amounts to an express waiver of immunity under these circumstances. Given that, in the Second Circuit, liability is to be considered the opposite of immunity, there can be no doubt it does.

It should be noted that there is only a single reference each in 389 and 903 to immunity, and each reference is in relation to the liability clause in model SOFA that existed <u>before</u> reports 389 and 903 were issued and adopted as the official position of the General Assembly. In other words, these references to immunity discuss only the immunity that had existed before the express waivers in 389 and 903 were

---

[24] Id., at 10.
[25] Id.
[26] UN A/RES/52/247.
[27] Id., at 2.

made.[28] If the Secretary-General and the General Assembly of the United Nations had intended to retain immunity, they would have said so. Surely they understood that, under law, to accept liability includes not just accepting blame or fault or moral responsibility, but rather to agree to be judicially bound. Simply put, in repeatedly, clearly and unambiguously accepting liability (albeit with certain conditions attached), the United Nations expressly waived its immunity as stated in Section 2 of the CPIUN. This is not implicit, or hinted at in vague and uncertain terms. It is express under any definition in the law.

This position is entirely consistent with *Brzak* and *Georges*, the law in this Circuit on this matter. *Brzak,* for example, a decision that, in the main, focuses on the self-executing nature of the CPIUN, states only that to suggest that "purported inadequacies with the United Nations' internal dispute mechanism" indicate a waiver of immunity "would read the word 'expressly' out of the CPIUN."[29] Plaintiffs make no such assertion here.

The United Nations and the U.S. Government, of course, might argue that unless the United Nations used the words "…we expressly waive immunity…" waiver is not express. The law, however, says otherwise. For example: In *United States v. Chalmers,* No. S5 05 CR 59(DC), 2007 U.S. Dist. LEXIS 13232, 2007 WL 624063, at *2 (S.D.N.Y. Feb. 26, 2007), the court stated that express waiver of immunity requires "a clear and unambiguous manifestation of the intent to waive."[30] It decidedly did <u>not</u> require that the exact words "we expressly waive," or even "we waive immunity" need to be stated, only that a clear and unambiguous manifestation be made. As shown above, there has been just such a clear and unambiguous manifestation in this instance for this particular type of case. The notion that the use of exact words "express waiver" or "expressly waive" need to be used in order for a waiver to be express would be ludicrous and an offense to modern concepts of and justice. The tragedy that has been wrought on the people of Haiti by the United Nations may be biblical in proportions, but we are not living in biblical times, where a husband had to announce "I divorce thee…" three times for a divorce to be

---

[28] UN A/51/389, at 4, and UN a/51/903, at 4, both referencing UN A/45/594, dated October 9, 1990.
[29] *Brzak, at 112. Georges,* for its part, merely adopts the language of *Brzak* on this point.
[30] *Chalmers* cites *Libra Bank Ltd. v. Banco Nacional De Costa Rica*, 676 F.2d 47, 49 (2d Cir. 1982) in support of this proposition.

effective. The law clearly does not require the words "expressly waive immunity" for a waiver to be express. As *United States v. Chalmers* clearly states, it need only be "a clear and unambiguous manifestation of the intent to waive."

It is also abundantly clear that once United Nations immunity is waived, it cannot be asserted later. This is the finding in *U.S. v. Bahel,* 662 F.3d 610 (2d Circuit, 2011), where a UN official attempted to re-assert immunity after having waived in at trial. Therefore, the UN's letter to the US Government attempting to reassert immunity in this case has no legal validity. To rule otherwise would create another absurdity, similar to that discussed above, where the United Nations could appear to waive immunity with regard to a particular case or class of cases, only to reassert such immunity later when it decides it doesn't like the particular case before the court, or the price tag, or the parties, or their nationality, their religion, their gender or some other characteristic.

Finally, the notion expressed by the United States Government that "the UN actions referred to by plaintiffs appear, at most, to express a general commitment to provide for compensation for injury to innocent third parties during the course of peacekeeping operations, which is what the SOFA itself states"[31] is highly unreasonable in light of the specificity and detail of the Secretary-General of the United Nations in 389 and 903, and the express adoption of this position by the United Nations General Assembly in resolution 52/247, rendering such specific acceptance of liability binding upon the United Nations. This was no mere "general commitment" to provide compensation, no vague "aspiration" to do what's right if one can, to voluntarily help if the funds are available. This was a clear, unambiguous and specific agreement to be bound by law and justice to compensate for such damages, to be subject to a duty that can be judicially enforced. In other words, it was an express waiver of immunity, and this court has subject-matter jurisdiction over this claim.[32]

---

[31] U.S. Government Statement of Interest, at 5.

[32] *Dennick* v. *Railroad Co.*, 103 U.S. 11, 18, 26 L. Ed. 439 (1881): "Wherever, by either the common law or the statute law… a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters…."

### III. WHILE THE OPINION OF THE EXECUTIVE BRANCH IS NORMALLY GIVEN "GREAT WEIGHT," IT SHOULD NOT BE GIVEN SUCH DEFERENCE IN THIS CASE

While it is true that courts may generally afford "great weight" to the Government's interpretation a treaty, see, e.g., *Medellin v. Texas*, 552 U.S. 491, 513 (2008), this Court has final authority to determine whether the United Nations has expressly waived its immunity as required under Section 2 of the CPIUN. See, e.g., *Restatement (Third) of the Foreign Relations Law of the U.S.*, § 326, and *Shamsee v. Shamsee,* 74 A.D.2d 357, 360 (N.Y. App. Div. 1980) ("[T]he question of immunity from legal process under treaties and statutes of the United States lies within the province of the courts …. [C]laims of immunity must be resolved by the court on the basis of the facts properly before it."). This Court need not substitute the Government's interpretation of immunity for its own here, where the Government's interpretation of the scope of immunity would result in a denial of Plaintiffs' constitutional rights. *Sanders v. Szubin*, 828 F. Supp. 2d 542, 548 (E.D.N.Y. 2011) (stating that district courts need not defer to the Executive Branch's disposition of constitutional issues and instead must engage in its own de novo review).

Such deference is due only when that interpretation is reasonable, as is clearly shown in *Ehrlich v. Am. Airlines, Inc.,* 360 F.3d 366 (2d Cir. 2004), which stated: **"**[a]lthough we owe respect to the views of the Executive Branch in regard to the meaning of an international treaty, such deference is "ordinarily due" only to the "*reasonable* views" of the government." In Ehrlich, the court found that "[t]he opinion expressed by the American delegate… was not a "reasonable view" to which we must defer." See also *Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012) ("...deference to the Department's interpretation of the treaty is warranted to the extent it is persuasive."). So it is clear under the law that a court may disregard the Executive's position when it finds that position to be unreasonable.

As described above, the opinion of the United States Government in this case is quite unreasonable and not at all persuasive. The Government, for example, argues that the reference to "in any particular case" in Section 2 of the CPIUN means that the United Nations must make an express statement waiving immunity individually and separately, at the time that each individual claim is brought before a Court. For the reasons cited above, this is not true. The Government also suggests in its

Statement Of Interest that the UN's unambiguous and clear acceptance of liability is merely a "a general commitment to provide for compensation for injury to innocent third parties…" In the face of the voluminous evidence to the contrary described above, this position, too, is neither reasonable nor persuasive.

Finally, the Court should take note that there is evidence emerging to indicate that the Executive branch has engaged in actions related to the cholera plague in Haiti that, at the very least, show considerable bad faith with relation to this matter. As detailed in an article on March 30, 2017, which appeared on the *Slate* magazine website and was written by the journalist Jonathan Katz (who has covered the cholera epidemic in Haiti from the beginning):

> As seen in newly revealed emails, reported here for the first time, officials at the highest levels of the U.S. government were aware almost immediately that U.N. forces likely played a role in the outbreak. Multiple federal agencies, from national security officials to scientists on the front lines, shielded the United Nations from accountability to protect the organization and themselves. Obama's U.N. ambassadors, Susan Rice and Samantha Power, dodged the issue as the administration danced between often contradictory goals of protecting human rights, asserting American dominance, and defending an institution central to its multilateral diplomacy.[33]

The article further details the manner in which U.S. officials, including at the CDC, sought to "message" their scientific result properly, because "[t]he last thing we would want is for Haitians to blame the UN soldiers in a pernicious way."[34] U.S. Government officials appear to have intentionally minimized the UN's responsibility for the cholera epidemic in direct contravention of all norms of proper scientific response to an disease outbreak, concerned more with the impact such an admission would have on the UN than proper protocols at the outbreak of an epidemic:

> Thanks in part to aggressive official denial and pushback in the press, most people outside Haiti would not learn about the probable link for months, if not years. The U.N. would continue denying any involvement in the outbreak until it finally admitted in 2016 having played a role. By then, at least 800,000 people in Haiti had been sickened and officially more than 9,500 killed, with experts estimating the real toll could be two or three times higher.[35]

---

[33] http://www.slate.com/articles/news_and_politics/foreigners/2017/03/when_the_u_n_sowed_cholera_in_haiti_how_fast_did_americans_know.html?wpsrc=sh_all_dt_fb_bot
[34] Id.
[35] Id.

Moreover, most recently, nations including the United States have again indicated that they will not be contributing to any fund to help the victims of the cholera epidemic in Haiti. As reported in *Foreign Policy* magazine:

> The Trump administration has not contributed a penny to the fund, and it has no intention of doing so in the future, according to U.S. and U.N. officials. The administration has argued that it is not responsible for the epidemic, which it blames on U.N. incompetence...[36]

This is not in any way to attack the motives of the attorneys before the court in this present action, but only to point out that there is considerable evidence to suggest that the Government's position with relation to this claim may not be reasonable, and therefore should not be given deference or "great weight" when considering the questions before the court.

## IV.     SERVICE ON THE DEFENDANTS WAS EFFECTIVE

Finally, there is a suggestion in the Government's Statement of Interest that Plaintiffs have not adequately served the United Nations as an organization, nor the individual Defendants, including Ban-Ki Moon, who at the time was Secretary-General of the United Nations. The Plaintiffs assert that service has been effected on the Defendants and to argue otherwise would lead to a violation of the Plaintiffs' rights to due process under the law and would be contrary to public policy. As admitted by the Government in its Statement of Interest, and the United Nations in its letter of May 2, 2017, attached as an exhibit to the Government's Statement of Interest (*See* ECF No. 17), Defendants received service of the complaint and summons via various means, including in person and via facsimile. Furthermore, Defendant Ban was personally served via process server on June 20, 2014 (*See* ECF No. 4). Despite the Defendants' claim that service is not accepted because a waiver of immunity has not been expressly issued, as discussed *infra*, if this Court finds express waiver of said immunity, then service was proper. *Noble v. Crazetees.com*, for example, held that where "traditional service of [process] is impracticable and [alternative] service comports with the requirements of due process," such alternative service may be deemed "complete and effective." No. 13-cv-5086 (PAE), slip op. at 1 (S.D.N.Y. Jan. 28, 2014) (granting a motion requesting that the Court declare that service had been sufficiently made by e-mail, after plaintiffs unsuccessfully attempted service by personal delivery at several locations). *Noble*'s holding is

---

[36] http://foreignpolicy.com/2017/06/01/trump-wont-pay-a-penny-for-u-n-cholera-relief-fund-in-haiti/

applicable here. After having made numerous unsuccessful attempts to accomplish service of process through the ordinary methods set forth in the Federal Rules of Civil Procedure, Plaintiffs completely and effectively served the UN facsimile by alternate methods, in addition to personal service on Defendant Ban.

Whether service of process is impracticable is "depend[ent] upon the facts and circumstances of the particular case." *Markoff v. S. Nassau Cmty. Hosp.*, 458 N.Y.S.2d 672, 673 (N.Y. App. Div. 1983), *aff'd* 473 N.Y.S.2d 766 (1984); *see also Safadjou v. Mohammadi*, 964 N.Y.S.2d 801, 803 (N.Y. App. Div. 2013). As a general rule, the impracticability requirement is met where plaintiffs make a showing that service cannot be made by a statutorily prescribed method. *Snyder v. Energy Inc.*, 857 N.Y.S.2d 442, 446 (N.Y. Civ. Ct. 2008); *David v. Total Identity Corp.*, 857 N.Y.S.2d 380, 381-82 (N.Y. App. Div. 2008). Such a showing requires "somewhat less than. . .'due diligence,'" meaning that proof of "specific instances of attempted service" is sufficient but not necessary. *Liebeskind v. Liebeskind*, 449 N.Y.S.2d 226, 229 (N.Y. App. Div. 1982); *see also Metromedia Co. v. Cowan*, 13 CIV. 03787 LGS, 2013 WL 4780039, at *1 (S.D.N.Y. June 24, 2013) ("the impracticability standard … does not require the applicant to satisfy the more stringent standard of 'due diligence' … or to make a showing that actual prior attempts to serve a party under each and every method provided in the statute have been undertaken").

As to personal service of Secretary-General Ban, the United States cites *Tachiona vs. Mugabe*, 386 F.3d 205 (2d Cir. 2004) in support of their position that Secretary Ban's diplomatic immunity prevented such service. However, this case is distinguishable. In *Tachiona*, the Defendants visited New York City as delegates to the United Nations Millennium Summit representing Zimbabwean. During their visit, the Defendants attended a private political function and fundraising event. Prior to entering the event, the Defendants were served a complaint alleging various violations of human rights and international law. Several months after the Defendants were served with process, the United States filed a suggestion of immunity pursuant to 28 U.S.C. § 517, in which it asserted that the claims against the two men should be dismissed on grounds of diplomatic and head-of-state immunity. The United States further argued that the claims against the Defendants should be dismissed because "under both the head of state

and diplomatic immunity doctrines, Mugabe and Mudenge had personal inviolability and could not be served with legal process in any capacity." At no time was there any evidence or assertion made by the Plaintiffs in *Tachiona* that a waiver of immunity had been expressly provided by Mugabe and Mudenge, contrary to the case before this Court.

Plaintiffs have met, and indeed surpassed, the impracticability standard by making numerous diligent attempts to serve the UN without success, prior to effecting service via facsimile on the Defendants, and effecting personal service on Defendant Ban.

## CONCLUSION

In repeatedly, unambiguously and clearly accepting legal liability for damages caused by peacekeeping forces not the result of operational necessity, the United Nations expressly waived immunity from legal process under Section 2 of the CPIUN. Moreover, nowhere in Section 2 of the CPIUN does it state the term "…in an particular case…" means solely that waiver of immunity can only occur in each separate, individual case, and only after it has been brought before a court. For these reasons, and understanding that the Court must accept all material facts alleged in the Complaint as true and draw all reasonable inferences liberally in Plaintiff's favor, Plaintiffs request that the Court rule that the UN has expressly waived its immunity from legal process in the case before this Court and that this Court has subject-matter jurisdiction over this claim, and that this case should proceed accordingly.

Further, Plaintiffs fully realize the interest of the Court in resolving this matter expeditiously and avoiding further delay, but respectfully requests the opportunity to be heard, either through additional briefing or through oral argument, on any new issues that are raised by either the United Nations or the Government in response to this filing, should they choose to submit a reply brief per the Court's recent order.

Dated: June 23, 2017
New York, New York

Respectfully submitted,

James F. Haggerty, Esq.
45 Broadway, Suite 3140
New York, New York 10006
jamesfhaggerty@gmail.com
(917) 453-1510

Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.
8511 Bull Headley Rd., Ste. 405
Tallahassee, FL 32312
(850) 298-4455
tim@howardjustice.com

Mark Gottlieb, Executive Director
Public Health Advocacy Institute Northeastern University School of Law
360 Huntington Avenue / 117 Cushing Hall
Boston MA 02115
(617)373-2026
mark@phaionline.org

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 23rd day of June, 2017, a true and correct copy of the foregoing document was served via mail, to the following:

United Nations
760 United Nations Plaza
New York, NY 10017

MINUSTAH Headquarters
Logistics Base
Boulevard Toussaint Louverture and Clercine 18
Port-au-Prince, Haiti

A copy has also been sent via electronic mail to:

Nicholas Cartier, Esq.
United States Department of Justice
nicolas.cartier@usdoj.gov


Dated: June 23, 2017
New York, New York


Respectfully submitted,


_____
James F. Haggerty, Esq.
45 Broadway, Suite 3140
New York, New York 10006
jamesfhaggerty@gmail.com
(917) 453-1510