```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MARIE LAVENTURE, et al.,

                            Plaintiffs,            MEMORANDUM & ORDER

            - against -                            14-CV-1611 (SLT) (RLM)


UNITED NATIONS, et al.,

                            Defendants.
-----------------------------------------------------------X
```

**TOWNES, United States District Judge,**

Plaintiffs brought this putative class action against the United Nations ("UN"), the United Nations Stabilization Mission in Haiti ("MINUSTAH"), and six current or former UN officials, seeking redress for injuries and death that resulted from an outbreak of cholera in Haiti in 2010. Defendants allegedly caused the outbreak by deploying cholera-infected UN peacekeeping troops to Haiti. Because defendants enjoy immunity from suit and because they have not waived that immunity here, the Court dismisses this action for lack of subject-matter jurisdiction.

## I. Background

### A. Parties

Plaintiffs Marie, Maggie, Sane, and Carmen Laventure are citizens of the United States or Haiti who reside in Queens, New York or Atlanta, Georgia. Second Amended Complaint dated June 23, 2017, Dkt. No. 20 ("2d Am. Compl."), ¶¶ 19–22.[1] Plaintiffs' father (Cherylusse Laventure) and stepmother (Marie Ttherèse Fleuriciane Delinais) died after contracting cholera

---

[1] The following facts are derived from the Second Amended Complaint and are assumed to be true for purposes of this decision.

in Haiti during the fall of 2012. *Id.* ¶¶ 214–23. Plaintiffs purport to sue on behalf of themselves, the estates of their deceased parents, and all others similarly situated.

Defendant UN is an international organization founded in 1945 and headquartered in New York City. *Id.* ¶ 26. The UN's functions include "'maintain[ing] international peace and security'" and "'promot[ing] and encourage[ing] respect for human rights.'" *Id.* (first alteration in original). Defendant MINUSTAH, a "subsidiary organ of the UN" based in Port-au-Prince, was established in 2004 to "enhance stability . . . , promote democracy and rule of law, and support the Haitian government as well as Haitian human rights institutions and groups." *Id.* ¶¶ 27, 62. MINUSTAH's operations in Haiti are governed in part by a Status of Forces Agreement ("SOFA") which was executed between the UN and the Haitian government in July 2004. *Id.* ¶¶ 60, 64.

Defendant Ban Ki-moon was, at all relevant times, the Secretary-General of the UN. *Id.* ¶ 28. The other individual defendants, Edmond Mulet, Chandra Srivastava, Paul Aghadjanian, Pedro Medrano, and Miguel de Serpa Soares, held various positions at the UN that involved the organization's activities in Haiti during the relevant period. *Id.* ¶¶ 29–34.

### B. Alleged Facts

Between October 9 and 16, 2010, defendants UN and MINUSTAH deployed 1,075 Nepalese peacekeeping troops to Haiti. *Id.* ¶ 73. Before their deployment, these troops received three months of training near the Kathmandu Valley—an area of Nepal that had experienced a widely reported cholera outbreak. *Id.* ¶¶ 74–75. In Haiti, the troops were stationed at a base near water banks that connected to the Artibonite River, a primary source of water for tens of thousands of Haitians. *Id.* ¶ 11. Untreated human waste from the base seeped into the water

banks, which resulted in an outbreak of cholera along the Artibonite River and eventually throughout the country. *Id.* ¶¶ 11, 13.

Before the arrival of the Nepalese troops in October 2010, Haiti had no reported cases of cholera. *Id.* ¶ 8. Between October 2010 and May 2011, more than 4,500 Haitians died from the disease. *Id.* ¶ 163. The death toll has now surpassed 9,000. *Id.* ¶¶ 2, 42. Cherylusse Laventure and Marie Tthérèse Fleuriciane Delinais, the father and stepmother of the named plaintiffs, are among the victims. *Id.* ¶¶ 19–23.

Defendants UN and MINUSTAH failed to test the Nepalese troops for cholera before their deployment. *Id.* ¶ 78. In March 2012, authors of a peer-reviewed study concluded that all evidence "point[ed] to Nepalese UN peacekeepers as the initial source of cholera in Haiti." *Id.* ¶ 182. On December 1, 2016, defendant and then-Secretary-General Ban Ki-moon stated that, on behalf of the UN, he was "'profoundly sorry'" for the organization's role in Haiti's cholera epidemic and that it had a "'moral responsibility' to make things right." *Id.* ¶ 17.

### C. Plaintiffs' Claims

Based on defendants' actions, plaintiffs assert claims of negligence, gross negligence, recklessness, wrongful death, negligent supervision, negligent and intentional inflection of emotional distress, nuisance, and breach of contract. *Id.* ¶¶ 228–89. As an alternative to damages, plaintiffs seek a declaratory judgment stating, among other things, that "the UN is required by law to establish a standing claims commission for Haiti, to process the Plaintiff class's third-party claims for property loss or damage and personal injury, illness or death arising from or directly attributed to MINUSTAH and its wrongful acts." *Id.* ¶ 298.

D.   **Procedural History**

Plaintiffs commenced this action by filing a complaint on March 11, 2014. Dkt. No. 1. Magistrate Judge Mann later stayed the case pending the Second Circuit's decision in *Georges v. United Nations*—an action that began in the Southern District of New York and involved similar claims against the UN for Haiti's cholera epidemic. Dkt. No. 8; *see Georges v. United Nations*, 84 F. Supp. 3d 246 (S.D.N.Y. 2015), *aff'd*, 834 F.3d 88 (2d Cir. 2016). On August 18, 2016, the Second Circuit affirmed the district court's decision to dismiss the case for lack of subject-matter jurisdiction on the ground that the defendants were immune from suit. *Georges*, 834 F.3d at 90.

In an order dated March 23, 2017 (Dkt. No. 13), Judge Mann directed plaintiffs to show cause for why this case should not be dismissed in light of *Georges*. In their written response, plaintiffs attempted to distinguish this case on the ground that, unlike the plaintiffs in *Georges*, they were arguing that defendants had "repeatedly and expressly" waived immunity otherwise available to them. Plaintiffs' Response to Order to Show Cause dated Mar. 30, 2017, Dkt. No. 14 ("Pl. OTC Response"), at 8; *see Georges*, 84 F. Supp. 3d at 249 ("Here, no party contends that the UN has expressly waived its immunity."). After expressing "serious doubts" about the viability of plaintiffs' waiver theory, Judge Mann nevertheless invited the United States to express its views pursuant to 28 U.S.C. § 517, and the Government did so in a statement of interest dated May 24, 2017. *See* Order dated Apr. 7, 2017, Dkt. No. 15; Government's Statement of Interest dated May 24, 2017, Dkt. No. 17 ("Gov't Statement").[2] Although none of the named defendants have appeared in this action, the Government's statement included as an exhibit a letter from the UN's Office of Legal Affairs to United States Ambassador to the UN

---

[2] 28 U.S.C. § 517 provides that the "Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States."

4

Nikki Haley, in which the UN states that it has not waived, and indeed expressly maintains, its immunity and the immunity of its officials with respect to this case. *See* Letter dated May 2, 2017, Dkt. No. 17-1 ("UN Letter"), at 3.

After receiving leave from the Court to do so (Dkt. No. 19), on June 23, 2017, plaintiffs filed a memorandum of law responding to the Government's statement of interest along with a proposed Second Amended Complaint. *See* Memorandum of Law in Opposition to the Government's Statement of Interest dated June 23, 2017, Dkt. No. 21 ("Pl. Mem."); 2d Am. Compl., Dkt. No. 20. The Government replied to plaintiffs' memorandum in a statement of interest dated July 7, 2017. *See* Government's Statement of Interest dated July 7, 2017, Dkt. No. 22 ("Gov't Reply").[3]

## II. Discussion

### A. Legal Standards

#### 1. Subject-Matter Jurisdiction

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also, e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008). Subject-matter jurisdiction is lacking when defendants are immune from suit. *See, e.g.*, *Georges*, 834 F.3d at 98 (no subject-matter jurisdiction where UN, MINUSTAH, and UN officials had immunity). In resolving the question of subject-matter jurisdiction, courts "must take all facts alleged in the complaint as true and

---

[3] Although the Court had previously denied their request for a more extensive briefing schedule (Dkt. No. 19), plaintiffs later filed a letter-motion for leave to file a sur-reply and to allow for limited discovery. Letter-Motion dated July 11, 2017, Dkt. No. 24. While styled as a request to file a sur-reply, the letter-motion itself includes substantive arguments responding to the Government's July 7 submission. *Id.* The Court has considered the arguments raised therein, but nonetheless concludes that it lacks subject-matter over this case. Consequently, the Court denies as moot plaintiffs' motion for additional briefing and for discovery.

5

draw all reasonable inferences in favor of plaintiff." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (internal quotation marks omitted). The Court may consider documents outside the pleadings when making this inquiry. *See, e.g., Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*

### 2. Treaty Interpretation

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008). "Where the language of . . . an international treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 457 (2d Cir. 2003). It is "settled that the United States' interpretation of a treaty is entitled to great weight." *Medellin*, 552 U.S. at 513 (internal quotation marks omitted); *see also Lozano v. Alvarez*, 697 F.3d 41, 50 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 134 S. Ct. 1224 (2014) ("[W]hile the interpretation of a treaty is a question of law for the courts, given the nature of the document and the unique relationships it implicates, the Executive Branch's interpretation of a treaty is entitled to great weight.") (internal quotation marks omitted).

### B. Analysis

#### 1. Immunity of UN and MINUSTAH

The Charter of the UN, which was ratified and entered into force with respect to the United States in 1945, provides that the UN "shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes." U.N. Charter art. 105, ¶ 1; *Ahmed v. Hoque*, No. 01-CV-7224 (DLC), 2002 WL 1964806, at *3 n.3 (S.D.N.Y.

6

Aug. 23, 2002). The Convention on the Privileges and Immunities of the United Nations ("CPIUN"), which was adopted in 1946 and came into force with respect to the United States in 1970, specifies that the UN "shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." CPIUN art. II, § 2, 21 U.S.T. 1418; *Brzak v. United Nations*, 597 F.3d 107, 110–11 (2d Cir. 2010); *Georges*, 84 F. Supp. 3d at 248.

Thus, by its own terms, the CPIUN requires courts to recognize and to respect the UN's "immunity from every form of legal process" unless "in any particular case" the UN "expressly" waives its immunity. CPIUN art. II, § 2; *see also, e.g., Boimah v. United Nations General Assembly*, 664 F. Supp. 69, 71 (E.D.N.Y. 1987) ("Under [the CPIUN] the United Nations' immunity is absolute, subject only to the organization's express waiver thereof in particular cases."). "Express waiver [of immunity] requires a clear and unambiguous manifestation of the intent to waive." *United States v. Chalmers*, No. 05-CR-59 (DC), 2007 WL 624063, at *2 (S.D.N.Y. Feb. 26, 2007).

Here, in a letter addressed to Ambassador Nikki Haley, the UN states that it has "not waived, and indeed, expressly maintains the privileges and immunities of the United Nations and its officials in respect of this case." UN Letter at 3. Also, the letter requests that "competent United States authorities . . . take appropriate action to ensure full respect for the privileges and immunities of the United Nations and its officials." *Id.* at 2.

Plaintiffs nevertheless argue that the UN has expressly waived its immunity for harm caused by the Haitian cholera outbreak. Plaintiffs' argument rests primarily on two related reports published by the Secretary-General in 1996 and 1997, both of which were adopted by the UN General Assembly in 1998. Pl. Mem. at 9–14. These two reports—namely, Report

A/51/389 (published in 1996) and Report A/51/903 (published in 1997 as a supplement to Report A/51/389)—outline the manner in which the UN would accept liability for damages caused by UN peacekeeping operations, provided that such damages did not result from "operational necessity." Report A/51/389 dated Sept. 20, 1996, Dkt. No. 21-2 ("Report 389"); Report A/51/903 dated May 21, 1997, Dkt. No. 21-3 ("Report 903"). By agreeing to accept liability for its activities, plaintiffs contend that the UN expressly waived its immunity for purposes of this lawsuit. Pl. Mem. at 8–14; Pl. OTC Response at 8–9.

As the Government notes, however, both reports contemplate that claims against the UN would be resolved by non-judicial means, including through UN-established standing claims commissions, given that domestic courts—because of the broad immunity available to the UN and its officials—would not adjudicate such claims. *See* Gov't Reply at 2–3; Report 389 at 4 ¶ 7 (discussing settlement "by means of a standing claims commission claims . . . which for reasons of immunity of the Organization and its Members could not have been submitted to local courts"); Report 903 at 4 ¶ 7 (discussing "standing claims commission as a mechanism for the settlement of disputes . . . over which the local courts have no jurisdiction because of the immunity of the Organization or its members"). By agreeing to accept liability for its actions through the channels outlined in these reports, there is no indication that the UN was waiving immunity it enjoys in domestic courts.

Plaintiffs complain that the UN failed to create a standing claims commission to address injuries caused by the cholera outbreak, while contending that the SOFA between the UN and the Haitian government required it to create one. 2d Am. Compl. ¶ 7, 60. The Second Circuit, however, has concluded that the failure to create an adequate dispute-resolution mechanism does not constitute an express waiver of immunity secured by the CPIUN. *See Brzak*, 597 F.3d at 112

("Although the plaintiffs argue that purported inadequacies with the United Nations' internal dispute resolution mechanism indicate a waiver of immunity, crediting this argument would read the word 'expressly' out of the CPIUN."); *see also Georges*, 84 F. Supp. 3d at 249 ("[C]onstruing the UN's failure to provide 'appropriate modes of settlement' for Plaintiffs' claims as subjecting the UN to Plaintiffs' suit would read the strict express waiver requirement out of the CPIUN.").

Finally, plaintiffs fail to offer any plausible explanation for why these UN reports, which predate Haiti's cholera outbreak by more than a decade, constitute an express waiver of immunity in this "particular case." CPIUN art. II, § 2. Even if the reports had indicated that the UN was generally willing to subject itself to lawsuits in certain circumstances, the reports would still not establish that the organization had waived its immunity here. For these reasons, the Court concludes, consistent with the Government's view, that the CPIUN immunizes the UN from this suit. *See Medellin*, 552 U.S. at 513 ("[T]he United States' interpretation of a treaty is entitled to great weight.") (internal quotation marks omitted).

As a UN subsidiary, MINUSTAH enjoys the same privileges and immunities as the UN under the CPIUN. *See Georges*, 84 F. Supp. 3d at 249 ("MINUSTAH, as a subsidiary body of the UN, is also immune from suit"); *Sadikoglu v. United Nations Dev. Programme*, No. 11-CV-294 (PKC), 2011 WL 4953994, at *3 (S.D.N.Y. Oct. 14, 2011) (noting that "scope of immunity for the UN and its subsidiary bodies derives" from the "UN Charter" and "CPIUN"). Consequently, the Court lacks subject-matter jurisdiction over plaintiffs' claims against both the UN and MINUSTAH.

## 2. Immunity of Individual Defendants

The CPIUN provides that UN officials "shall . . . be immune from legal process in respect of . . . all acts performed by them in their official capacity," unless this immunity is waived by the Secretary-General or the Security Council. CPIUN art. V, §§ 18, 20. Thus, absent waiver, the CPIUN immunizes UN "officials sued for acts performed in their official capacities." *D'Cruz v. Annan*, No. 05-CV-8918 (DC), 2005 WL 3527153, at *1 (S.D.N.Y. Dec. 22, 2005), *aff'd*, 223 F. App'x 42 (2d Cir. 2007) (internal quotation marks omitted). UN officials also enjoy immunity for their official acts under the International Organizations Immunities Act ("IOIA"), Pub L. No. 79-291, 59 Stat. 669, 672 (1945) (codified at 22 U.S.C. § 288 *et seq.*). Specifically, the IOIA provides that UN "officers and employees are 'immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as . . . officers . . . or employees except insofar as such immunity may be waived' by the United Nations." *Id.* (quoting 22 U.S.C. § 288d(b)).

Here, plaintiffs have sued the individual defendants in their official capacities, and there is no indication that any relevant actions of the individual defendants fell outside the scope of their official duties. Further, there is no indication that the UN, or any of its organs, waived the immunity available to the individual defendants. To the contrary, the UN has expressly maintained their right to immunity. UN Letter at 3. For these reasons, the Court concludes, consistent with the Government's view, that the individual defendants are immune from suit under the CPIUN and IOIA. Consequently, the Court lacks subject-matter jurisdiction over the claims against them.[4]

---

[4] In addition to immunity for their official acts, the Government contends that defendants Soares and Mulet have diplomatic immunity by virtue of their current positions at the UN. In light of the above, however, the Court does not reach this issue or any other ground for dismissal raised

### III. Conclusion

For these reasons, this case is dismissed for lack of subject-matter jurisdiction. Plaintiffs' letter-motion to file a sur-reply and to open discovery (Dkt. No. 24) is denied as moot. The Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

s/SLT

SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
August 23, 2017

---

by the Government. *See Meintanas v. Hutomo*, No. 98-CV-2370 (LMM), 1999 WL 349628, at *2 n.1 (S.D.N.Y. May 28, 1999).